## STATE v. MASSACHUSETTS COMPANY.

Circuit Court, Escambia County.

September 8, 1956.

Richard W. Ervin, Attorney General, Ralph M. McLane, Ass't. Attorney General, and John D. Moriarty, Ass't. Attorney General, for plaintiffs State of Florida, Trustees of Internal Improvement Fund, State Board of Conservation and the Attorney General.

J. B. Hopkins, Pensacola, for intervenors Pensacola Sports Association and Pensacola Anglers & Hunters Club.

Joe J. Harrell and Richard H. Merritt, both of Pensacola, for defendant.

HAROLD B. CROSBY, Circuit Judge.

The original plaintiffs in this suit are the State of Florida, the Trustees of the Internal Improvement Fund of the State of Florida, the State Board of Conservation of the State of Florida, and the Attorney General of the State of Florida. Upon their petition for intervention, the court has also permitted to be joined as parties plaintiff the Pensacola Sports Association and Pensacola Anglers & Hunters Club, both non-profit corporations interested in sport fishing.

The defendant is the Massachusetts Company, a joint venture composed of Southern Scrap Material Company, Ltd., M. D. Friedman Company, a corporation, and Eastern Scrap and Salvage Company, a corporation.

There is no dispute that the court has jurisdiction of the parties and of the subject matter of this suit.

Plaintiffs seek to enjoin the defendant from trespassing upon the lands of the plaintiffs and from removing or attempting to remove from its present location the battleship *Massachusetts* (or what remains of it), which lies sunken in the Gulf of Mexico off the coast of Escambia County in territorial waters of the state of Florida. In order to preserve the subject matter of the suit intact until a final disposition could be made, the court has heretofore issued a temporary injunction against continued operations of the defendant except such as might be necessary to comply with the requirements of a bond posted by the defendant with the United States Corps of Engineers to indemnify against its creation of a hazard to navigation in its work on the sunken ship.

This suit involves questions of law that have in greater part not been presented or settled in this state. Counsel on both sides have made an able presentation of the evidence and have, at the request of the court, submitted thorough briefs of the law which have been most helpful. They are to be commended for their diligence.

Briefly, the facts before the court are these—The United States battleship *Massachusetts,* after first being used for coast artillery target practice, was scuttled and sunk in the Gulf of Mexico, approximately 1.2 miles off the entrance to Pensacola Bay, Escambia County, Florida, in the year 1922. It has remained there ever since, largely undisturbed except by action of wind and water, which has gradually caused it to sink deeper and deeper into the sand bottom. A portion of the gun turrets is still visible above the surface of the water. The sunken battleship is in such condition that it could not be restored to use as a vessel. It is, however, a haven for small marine life and therefore attracts larger fish which feed on such organisms. This, in turn, has made the site where the vessel lies a favorite fishing spot, so that it has over the years attracted and still does attract large numbers of anglers from the local community and from distant places. During the past few years, at least, relatively small parts of the ship's brass and fittings have from time to time been removed by individuals not parties to this suit.

There have been efforts to organize the salvage of the sunken ship at times in the past, but all proved abortive until the venture in which the defendant is now engaged. In the month of August, 1956, the defendant, after preparations extending over the last year or two and involving the outlay of several thousand dollars in expense, secured a navigational permit from the United States Corps of Engineers and commenced salvaging the battleship. Incident to the beginning of the work, the defendant took possession of the ship by marking it with buoys and lines. Within a few days thereafter this suit was filed and, after notice and hearing, the temporary injunction issued.

The evidence at final hearing shows that the former owner of the battleship, the United States, has left it undisturbed for many years, and the court finds that it was abandoned many years before this suit was begun. A telegram from the Secretary of the Navy, admitted in evidence, announces such abandonment, although it does not state the date of abandonment.

Upon the basis of the evidence, the court finds and will treat the *Massachusetts* as an abandoned, sunken wreck of a ship lying in navigable waters of the Gulf of Mexico within the territorial limits of the state of Florida, subject to the laws of the state of Florida and the jurisdiction of this court, and in the possession of the defendant. At the outset, it should be stated that the court finds no grounds upon which to enjoin the "trespass" alleged to exist independently of the right of property in the sunken battleship.

Three primary questions are raised in this proceeding — (1) Does the state of Florida, by reason of its ownership or control of the bottom lands upon which the *Massachusetts* lies, have a title to the wrecked ship superior to that of the defendant? (2) Does the law of Florida prohibit the taking or salvaging of the wrecked ship by the defendant? (3) Has the long continued use of the site of the wrecked ship by the public for fishing created a prescriptive right that debars the defendant from disturbing it?

After careful consideration of the briefs submitted by the parties and a search of the available authorities, the court is impelled to the conclusion that each of these questions must be answered in the negative and the plaintiffs' prayer for a permanent injunction denied.

Upon the first question, plaintiffs contend that the state of Florida owns the bottom land upon which the wrecked ship is resting and that title to personal property abandoned upon lands owned by the state is vested in the state. Under the plaintiffs'

theory, the defendant is a trespasser upon state property and, as a trespasser, cannot by taking possession of the abandoned hulk gain any rights in it as against the state. Plaintiffs cite two cases in support of this theory, Barker v. Bates (Mass. 1832), Pickering 255, 23 Am. Dec. 678, 682; and Mitchell v. Oklahoma Cotton Growers' Association (Okla. 1925), 235 Pac. 597. Neither of these cases, however, involved a wrecked vessel abandoned in navigable waters. The Barker case dealt with a stick of timber thrown up on the shore, and the Mitchell case was concerned with cotton lodged upon property of the plaintiff during a flood. There is substantial authority that even in this situation the finder of lost property would have priority over the owner of the realty on which it was found, Bridges v. Hawkesworth, 21 L.J. (Q.B.) 75; Hamaker v. Blanchard, 90 Pa. 377, 35 Am. Rep. 664, the rule recited in many cases being that the finder of lost property is entitled to it as against all the world except the true owner, regardless of where it is found. In no case has the court found any decision holding that a wrecked ship lying in navigable waters becomes the property of the owner of the bottom land, whether that owner be the sovereign or a private individual. All of the cases on the subject found by the court hold that a wrecked ship, abandoned in navigable waters, has no owner and belongs to the salvor. See, for example, In re Highland Nav. Corp. (D.C. N.Y. 1927), 24 F. 2d 582, aff'd (C.C.A. 2) 29 F. 2d 37; and Thompson v. U.S. (1929), 62 Ct. Cl. 516. In the absence of a statute on the subject, the authorities appear, therefore, to support the view that the wrecked ship would become the property of the first person or party reducing it to possession. See Howard v. Sharlin (Fla. 1952), 61 So. 2d 181.

Upon the second question, plaintiffs urge that two early English statutes establish the state's title to the abandoned property involved in this suit, the statute of 3 Edward I, chapter 4, which reads—

"Concerning Wrecks of the Sea, it is agreed, that where a Man, a Dog, or a Cat escape quick out of the Ship, that such Ship nor Barge, nor any Thing within them, shall be adjudged Wreck: (2) but the goods shall be saved and kept by View of the Sheriff, Coroner, or the King's Bailiff, and delivered into the Hands of such as are of the Crown, where the Goods were found; (3) so that if any sue for those Goods, and after prove that they were his, or perished in his keeping, within a Year and a Day, they shall be restored to him without Delay; and if not, they shall remain to the King, and be seized by the Sheriffs, Coroners, and Bailiffs, and shall be delivered to them of the Town, which shall answer before the Justices of the Wreck belonging to the King."

and the statute of 17 Edward II, chapter II, which provided—

"Also the King shall have Wreck of the Sea throughout the Realm, (2) Whales and great Sturgeons taken in the Sea or elsewhere within the Realm, (3) except in certain Places privileged by the King."

The term "wreck of the sea" as used in those statutes did not, however, refer to a wrecked ship but to wrecked goods. Nor does the term as used in the statutes include even goods if they are lying at the bottom of the sea. Hale, in De Jure Maris, at page 37, defines "wreck" in the context of these statutes as follows—

"The kinds of it are two: *First,* such as is called properly so, the goods cast upon the land or shore; *second,* improper, for goods that are a kind of sea waifs or stray; flotsam, jetsam and ligan."

The hulk *Massachusetts* fits none of these categories.

As against the plaintiffs' contention that sections 705.01—705.03, Florida Statutes 1955 (providing for the sale by the sheriff of "wrecked derelict goods, abandoned motor vehicle or other personal property" found in any county, with a portion of the proceeds to be paid to the salvor, a portion to the sheriff and county judge for their fees, and the balance to be paid into the state treasury unless claimed within a year and a day) constitute recognition by the Florida legislature of the English statutes cited above, the defendant argues that more nearly applicable is section 715.01, Florida Statutes 1955 (providing that title to "all personal property found in or upon public conveyances, premises at the time used for business purposes, parks, places of amusement, public recreation areas and other places open to the public is hereby vested in the finder unless the same be called for or claimed by the rightful owner thereof within six months after the finding . . ."). The court recognizes the apparent conflict between these statutes so 'ar as they may apply to the present case. In such a situation the .atest expression of the legislative will would normally be controlling and the later statute (section 715.01, enacted in 1947, as against sections 705.01—705.03, last amended in 1943), would be given effect. The court doubts that the legislature had in mind the particular problem presented in the present case when either of these statutes was enacted. It seems clear that sections 705.01—705.03 cannot be regarded as overturning the settled rule of law that a wrecked ship abandoned in navigable waters becomes the property of the first taker.

Concerning the third question, it is argued that the long continued use of the site of the abandoned ship by members of the

public as a fishing spot has established a prescriptive right that precludes the defendant from disturbing or removing the hulk. Unfortunately, the plaintiffs and the court have been unable to find any authority that would support this view; and the fact is that any member of the public has a right to travel in or upon navigable waters so long as he does not violate the maritime law. Nowhere has the court found the exercise of this right advanced as a basis for prohibiting the enterprise upon which the defendant is embarked.

In this proceeding the burden is upon the plaintiffs to establish their right to the injunctive relief sought. Upon a careful consideration of the evidence and the applicable law, the court cannot find that the plaintiffs have met this burden. While the court recognizes the interest that members of the public, particularly those who enjoy fishing, feel in this matter, this court is under a duty to protect individual rights as well as those of the state and the general public. In the absence of a valid legislative enactment, none of these parties should be deprived of a previously existing right at the caprice of a court of justice.

It is thereupon ordered, adjudged and decreed that the temporary injunction heretofore issued in this cause be, and it is hereby, dissolved; and that the complaint be, and it is hereby, dismissed at the cost of the plaintiffs.